540 So.2d 623 (1989)
QUITMAN KNITTING MILL and The Aetna Casualty & Surety Company
v.
Sherry SMITH.
No. 58247.
Supreme Court of Mississippi.
February 22, 1989.
*624 K. Hayes Callicutt, Shell, Buford, Bufkin, Callicutt & Perry, Jackson, for appellants.
Peter K. Smith, Quitman, Thomas J. Lowe, Jr., Jackson, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and ZUCCARO, JJ.
ZUCCARO, Justice, for the Court:
This is an appeal from a judgment in a worker's compensation case from the Circuit Court of Clarke County, affirming the decision of the Mississippi Worker's Compensation Commission. The claimant, Sherry Smith, was employed by Quitman Knitting Mill as a seamstress. The Aetna Casualty & Surety Company was Quitman's insurance carrier.
The claim arose out of an incident on May 27, 1977. Sherry Smith purchased a cold tablet called "Chex-it" from her employer and within 30 minutes she became ill and had severe trembling episodes which have recurred to the time of the hearing.
Defendant's motion to controvert was filed January 10, 1979. After the initial hearings the Administrative Judge found on November 15, 1982, that the incident did not occur within the course and scope of employment and causal relationship was not proven by a preponderance of the evidence. The full commission reversed on August 24, 1983, finding that claimant suffered an accidental injury when the "Chex-it" tablet exacerbated claimant's pre-existing congenital condition, contributing to the onset of essential tremors. The commission remanded for determination of the date of claimant's maximum medical recovery, the existence and extent of permanent impairment, and the degree of contribution of the pre-existing condition.
From this order the employer and carrier appealed to the Circuit Court. By agreed order, the appeal was dismissed and remanded to the commission on January 30, 1984.
Additional hearings resulted in the Administrative Judge's determination that fifty percent of the essential tremor condition was the result of Ms. Smith's reaction to *625 the "Chex-it" tablet provided by employer and taken by Smith on May 27, 1977. At a hearing on January 20, 1986, the Administrative Judge found that the condition was permanent.
On appeal to the full commission, the Administrative Judge's findings were affirmed on July 23, 1986. The circuit court also affirmed.
The employer and carrier appeal these findings raising the following issues:
Issue 1. Was the Commission manifestly wrong in finding that claimant's condition arose out of and in the course of employment?
Issue 2. Was the Commission manifestly wrong in finding that the claimant sustained any temporary total disability?
Issue 3. Did the Claimant fail to prove that the medical bills submitted were incurred as a result of her essential tremors?
Issue 4. Was proration of the claimant's disability manifestly wrong?

FACTS
On May 27, 1977, Sherry Smith, was employed by Quitman Knitting Mill as a seamstress. She had previously been employed by Quitman Mill from September 1973 to November 1975. On May 23, 1977, Ms. Smith applied, and was tested for employment. She was given a pre-employment physical by Dr. Walter Gunn, who found her fit to work. Ms. Smith began working on May 24, under the direct supervision of Ms. Dorothy Dykes and Ms. Grace Long.
At the time of her re-employment and physical examination, Ms. Smith was taking a diet pill known as Ionamin. She took one on Friday, May 27, before departing for work. She was taking birth control pills. She was also taking a pill for a kidney infection and had previously had three penicillin tablets daily for the infection.
Ms. Smith arrived at Quitman Mill at approximately 7:00 a.m., suffering from a bad cold and within a short time her symptoms got worse. Ms. Dorothy Dykes advised her that the employer kept and sold "Chex-it" cold tablets. Notice of availability of these tablets was given to employees by a company memorandum dated November 7, 1973, signed by Sara Coker, personnel manager of the Quitman Knitting Mill. Ms. Smith purchased a "Chex-it" tablet from Quitman and returned to her machine. Approximately 30 minutes later Ms. Smith became dizzy and went to the rest room. She started shaking uncontrollably, whereupon she was taken to the first-aid room and from there to Dr. Walter Gunn's office. Dr. Gunn observed that she was having intermittent hand and head jerking sensations. Dr. Gunn injected Ms. Smith with one cc. of an antihistamine and he sent her home. Friday night Ms. Smith was treated at Wayne General Hospital in Waynesboro by Dr. James Dabbs. An injection prescribed by Dr. Dabbs at that time afforded Ms. Smith relief until the following evening.
On May 29, Ms. Smith was again admitted to Wayne General Hospital. After releasing her on June 3, 1977, Dr. Dabbs referred her to Dr. Curtis Graf, a neurologist in Mobile, Alabama. Dr. Graf treated Ms. Smith from June 1977 until January, 1978.
Dr. Graf testified he examined Ms. Smith on June 9, 1977, and admitted her to Mobile Infirmary Hospital on June 15, 1977. He recorded a history consistent with her testimony concerning the onset of her symptoms. He also recorded a history of Ms. Smith's mother and maternal grandfather having similar tremors. Dr. Graf testified that Ms. Smith's inherited type tremor will continue throughout the remainder of her life and probably would have developed eventually without the precipitating event of May 27, 1977. In Dr. Graf's opinion the "Chex-it" cold medication, which contained phenylpropanolamine, in combination with the Ionamin, influenced Ms. Smith's underlying problem and, thus, "certainly had a bearing on the manifestation of this tremor, at that time." Dr. Graf noted that Ms. Smith had taken Ionamin for several months with no adverse effect and testified the Ionamin alone was not the precipitating factor in the manifestation of her tremor on May 27, 1977.
*626 Ms. Smith sought re-employment at Quitman Knitting Mill in June, 1977, but was informed her employment had been terminated. She worked as a sweeper for Erwin Mills-Burlington Sportswear for one month in 1978, but was fired when her condition was discovered because her supervisors considered the trembling to be a "work hazard."
Dr. Robert Currier, neurologist, testified on direct examination for Quitman that the "Chex-it" tablet might well have played a part in the manifestation of Ms. Smith's tremors but was not the cause of her permanent condition.

I.

DID THE ONSET OF CLAIMANT'S CONDITION ARISE OUT OF AND IN THE 
COURSE OF EMPLOYMENT?
The appellant/employer contends that claimant's essential tremors are congenital and that claimant was programmed through her genes to develop permanent essential tremors. In addition, the proof that the "Chex-it" cold tablet triggered the onset of this condition is characterized by appellant as inadequate. Employer also contends that the sale of the cold tablet gave no benefit to the employer, citing cases from other jurisdictions which held that such injuries were not compensable.
Appellee cites Collums v. Caledonia Manufacturing Company, 237 Miss. 607, 115 So.2d 672, 673 (1959), and Big "2" Engine Rebuilders v. Freeman, 379 So.2d 888 (Miss. 1980) for the proposition that injuries arising from personal comfort activities which are reasonable incidents of employment are compensable.
In Collums, the employee purchased a soft drink from a vending machine kept on the employer's premises for the convenience and refreshment of its personnel. On noticing what was later identified as a mouse in the drink the employee became ill. The Worker's Compensation Commission found the employee temporarily and totally disabled for approximately ten days. In affirming the Commission's decision, the Collums court stated that an activity need not be strictly necessary if it is reasonably incidental to the employment.
What is reasonably incidental depends both on the practices permitted in the particular plant, which here included the maintenance of the box of cola with ice furnished by the employer, and on the customs of the employment environment generally.
115 So.2d at 673.
The following uncontroverted facts were presented: claimant returned to work after a two-year absence on Monday, May 23, 1977; prior to re-employment she was given a pre-employment physical by Dr. Walter Gunn, who found her fit to work at Quitman Knitting Mill; she arrived at the Mill on Friday, May 27, at approximately 7:00 a.m., with a bad cold, but able to work; between 7:30 and 8:00, she purchased a "Chex-it" cold tablet from the employer; within thirty minutes to an hour later she became ill and began to shake uncontrollably; she was transported by stretcher to Dr. Gunn's office where she was given a shot and sent home; later that night she was admitted to Wayne General Hospital; Sherry Smith's condition persisted and she continues to experience tremors.
The Administrative Judge initially denied Sherry Smith's claim. The full commission reversed the Order of the Administrative Judge, finding that claimant suffered an accidental injury on May 27, 1977, when the "Chex-it" tablet exacerbated her pre-existing congenital condition and contributed to the onset of her essential tremor. The commission also found that the accident arose within the temporal and spatial limits of employment and the medication was provided by the employer. The employer gained the benefits of lessening absenteeism due to illness by distributing the medication. By memoranda, the employer suggested to its employees that they avail themselves of the medication provided at employer's first-aid station.
This Court's scope of review was explored in Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss. 1988):
The Workers' Compensation Commission is the trier and finder of facts in a *627 compensation claim, the findings of the Administrative Law Judge to the contrary notwithstanding. See, Dunn, Mississippi Workers' Compensation § 284 (3d ed. 1982). If the Commission's findings of fact and order are supported by substantial evidence, all appellate courts are bound thereby. Champion Cable Const. Co., Inc. v. Monts, 511 So.2d 924, 927 (Miss. 1987); Penrod Drilling Co. v. Etheridge, 487 So.2d 1330, 1332 (Miss. 1986); Georgia-Pacific Corp. v. Veal, 484 So.2d 1025, 1027 (Miss. 1986) (and cases cited therein); and Evans v. Marko Planning, Inc., 447 So.2d 130, 132 (Miss. 1984) (and cases cited therein); see also, Dunn, Mississippi Workers' Compensation §§ 286, 288 (3d ed. 1982). This is so, even though the evidence would convince this Court otherwise, were we the fact finder. Georgia Pacific Corp., 484 So.2d at 1028 (quoting Olen Burrage Trucking Co. v. Chandler, 475 So.2d 437, 438 (Miss. 1985)). Stated differently, this Court will reverse the Commission's order only if it finds that order clearly erroneous and contrary to the overwhelming weight of the evidence. Myles v. Rockwell International, 445 So.2d 528, 536 (Miss. 1983) (citing Masonite Corp. v. Fields, 229 Miss. 524, 91 So.2d 282 (1956); and Riverside of Marks v. Russell, 324 So.2d 759, 762 (Miss. 1975).
We find that the Commission's determination that the onset of Ms. Smith's essential tremors arose out of and in the course of employment is supported by substantial evidence and is consistent with Collums v. Caledonia Mfg. Co., supra. Therefore, the finding of the Commission is affirmed.

II.

DID THE CLAIMANT HAVE ANY TEMPORARY TOTAL DISABILITY?
The employer contends that because claimant's tremors are permanent once they began, she is not entitled to temporary disability.
The Administrative Judge found that, according to the testimony of Dr. Curtis Graf, as of December 13, 1979, the claimant had reached a point at which she was fairly stable with her illness and probably had reached maximum medical improvement. Based on this factual finding, the employer was ordered to pay the claimant temporary total disability benefits in the amount of $62.66 per week beginning on May 27, 1977, and continuing thereafter until December 13, 1979.
2 Larson's Workmen's Compensation Law § 57.12(b) explains that temporary total disability is intended to compensate the claimant during the period of healing following the usual industrial injury. This period is followed by recovery, or stabilization of the condition. Professor Larson's treatise identifies this issue as involving both medical and non-medical components.
The medical component involves a determination that further strengthening may be anticipated. § 57.12(c). The non-medical component involves facts touching on claimant's employment situation. § 57.12(d).
As stated in General Elec. Co. v. McKinnon, 507 So.2d 363, 366 (Miss. 1987):
In accordance with the statute, compensation shall be paid for permanent partial disability following payment for temporary total disability. Therefore, an employee may be entitled to the maximum compensation for his permanent partial disability in addition to compensation for his temporary total disability, . .. .
See Mississippi Code Annotated, § 71-3-17(b), (c).
From the Administrative Judge's finding and Dr. Graf's deposition, it is apparent that prior to December 13, 1979 claimant's tremors were either not controllable or unpredictable to the extent that she could not function normally. The record indicates that various medications were used on Ms. Smith to control the tremors. Some worked better than others. Therefore, even though the condition was a permanent partial disability from its initial onset, until the tremors were controllable or predictable the condition was totally disabling.
*628 We find that the Administrative Judge was correct in finding that Dr. Graf's testimony supported an award of total temporary disability payments. This assignment is without merit and the award of temporary total disability is affirmed.

III.

DID CLAIMANT FAIL TO PROVE THAT THE MEDICAL BILLS SUBMITTED WERE INCURRED AS A RESULT OF HER ESSENTIAL TREMORS?
The order of the Administrative Judge, issued after a hearing on March 26, 1985, directs the employer to "pay for, furnish and provide to the claimant all reasonable and necessary medical services and supplies for the specific medical treatment of her essential tremor condition as provided in § 71-3-15. M.C.A. (1972)." The administrative judge did not determine an exact amount to be paid.
In this hearing the claimant submitted a list of drugs taken which totalled $10,160.30. After the March hearing the record was reopened for submission of medical bills. Various bills were submitted. Claimant made no attempt to compile these bills in any logical order; explain them; or provide a total.
The appellant/employer correctly asserts that the record is totally void of any required forms for bills for medical treatment and bills for drugs. Appellant cites § 71-3-15(1), (3), M.C.A. (1972):
(1) ... the physician giving such treatment shall furnish to the employer and the commission a report of such injury and treatment, on a form prescribed by the commission.
(3) ... no medical bills shall be paid to any doctor until all forms required by the commission have been filed.
Appellant also contends that the services provided by Drs. O'Neil, Harmon, French and Diaz were not connected with the claimant's essential tremors.
Dr. Diaz testified that she treated Ms. Smith for an hysterical reaction to anger which resulted in an inability to unclench her fist. Dr. Harmon treated her for anxiety and a urinary tract infection. Dr. French treated Ms. Smith for a reaction to phenothiazine, a medication for psychosis. Dr. O'Neil treated her for injuries sustained in a physical assault by an unknown assailant.
Ms. Smith contends that all treatments can be traced to essential tremors. She also contends that although Dr. O'Neil initially treated her for the beating, on the third day after admission she began having gross career form movements very similar to the initial incident in 1977, and was subsequently treated for this.
Ms. Smith contends that the Commission is given discretion by the statute itself to require whatever forms it needs to evaluate claims for payment of medical expenses. General Rule 9 of the Commission allows the Commission to excuse the requirement of form bills for medical treatment.
On reviewing the record, we find the evidence concerning medical expenses connected to Ms. Smith's essential tremors to be inadequate. Therefore, we remand this case to the Worker's Compensation Commission for a hearing on medical expenses incurred as a result of Ms. Smith's essential tremors and an order based on its findings.

IV.

ANY PRORATION OF THE CLAIMANT'S DISABILITY IS MANIFESTLY WRONG.
In his order of January 20, 1986, the Administrative Judge made the following finding of fact:
Based upon the fact that the claimant had an existing inherited tendency to have the essential tremor at some point in her life, Dr. Graf expressed an opinion that fifty (50%) percent of her condition was the result of the pre-existing condition and fifty (50%) percent of her tremor condition was the result of the May 27, 1977, on-the-job episode.
On behalf of the employer and carrier, the depositions of Dr. M.R. O'Neil, Dr. Terry French, Dr. Frank Harmon, Dr. *629 Maria S. Diaz, Dr. Robert Currier, and Dr. William E. Bowlus were introduced into evidence in this cause.
Having considered all of the evidence herein in compliance with the Full Commission Order dated August 24, 1983, I find that the claimant's essential tremor condition is permanent in nature: ... .
... and that fifty percent (50%) of the essential tremor condition suffered by the claimant is the result of her work-related episode that occurred at her place of employment on May 27, 1977, and fifty percent (50%) of her essential tremor condition is the result of the claimant's pre-existing condition.
The Administrative Judge then ordered the employer to pay permanent partial disability in the amount of $31.33 per week beginning on December 14, 1979, and continuing for a period of 450 weeks.
Employer contends that Dr. Graf changed his opinion of the extent of claimant's disability and that the proof is overwhelming that no drug can cause the manifestation of essential tremors.
The employer cites Flintkote Company v. Jackson, 192 So.2d 395 (Miss. 1966) for the proposition that claimant must prove her injury is compensable.
Jackson is distinguishable in this case. In Jackson, the claimant, prior to the incident which gave rise to his claim, suffered from cardiovascular disease for several years and had been hospitalized previously for that condition. His family doctor testified that Jackson's employment activities were not responsible for the stroke. 192 So.2d at 397.
The claimant in this case did not display any symptoms of essential tremors before she ingested the "Chex-it." The physician employed by Quitman Knitting Mills testified that only one week prior to the incident, claimant was "fit to work."
As stated in General Electric Co. v. McKinnon, 507 So.2d 363 (Miss. 1987):
Section 71-2-7, Mississippi Code Annotated (1972), governs apportionment between the injury and the pre-existing malady. Bennett v. United Parcel Service, 382 So.2d 469 (Miss. 1982). That section provides in part:
Where a pre-existing physical handicap, disease, or lesion is shown by medical findings to be a material contributing factor in which results following injury, the compensation which, but for this paragraph, would be payable shall be reduced by that proportion which such pre-existing physical handicap, disease, or lesion contributed to the production of the results following the injury.
(a) Apportionment shall not be applied until the claimant has reached maximum medical recovery.
(b) The employer or carrier does not have the power to determine the date of maximum medical recovery or percentage of apportionment. This must be done by the attorney-referee, subject to review by the commission as the ultimate finder of fact. (emphasis added)
We have enunciated the burden of proof on the employer-carrier for showing a pre-existing condition for the purpose of apportioning permanent partial disability benefits. See Walls v. Hodo Chevrolet Co., Inc., 302 So.2d 862, 865 (Miss. 1974). In Walls we emphasized that the employer-carrier had to prove not only the pre-existing condition existed, but this proof must be supported by medical findings. Moreover, the employer-carrier must show that the pre-existing condition continued to exist and was a material contributing factor in the results following the present injury.
507 So.2d at 368.
Employer relies on the testimony of Drs. O'Neil, French, Harmon, Diaz, Currier and Bowlus. Dr. Currier initially refused to give an opinion concerning the percentage of causation of claimant's tremors because he had not examined her. Then reluctantly he guessed at five percent (5%). Later on cross-examination he changed that figure to one percent (1%). Dr. Bowlus stated that the causal relationship was one to five percent (1% to 5%). On cross-examination, Dr. Bowlus admitted he was not familiar *630 with Ms. Smith's case and even stated he did not recognize the described condition as essential tremors. Drs. O'Neil; Diaz; Harmon; and French testified concerning treatment of claimant's varied ailments. None gave an opinion concerning apportionment.
Ms. Smith testified that she sought reemployment at Quitman Knitting Mills. They refused to re-hire her. Gilda Page, claimant's supervisor, confirmed this fact. Ms. Smith obtained employment at another mill but was terminated when her condition became apparent.
As we stated in Marshall Durbin, Inc. v. Hall, 490 So.2d 877, 879 (Miss. 1986):
Our function is to determine whether there is substantial credible evidence which would support the factual determination made by the Commission Georgia-Pacific Corporation v. Veal, 484 So.2d 1025, 1027 (Miss. 1986). If there should be such substantial credible evidence, we are without authority to disturb that which the Commission has found, even though that evidence would not be sufficient to convince us were we the factfinders. Olen Burrage Trucking Co. v. Chandler, 475 So.2d 437, 439 (Miss. 1985); South Central Bell Telephone Company v. Aden, 474 So.2d 584, 589-90 (Miss. 1985); Staple Cotton Services Association v. Russell, 399 So.2d 224, 228-29 (Miss. 1981); King & Heath Construction Co. v. Hester, 360 So.2d 692, 694 (Miss. 1978).
Here, as in Hall, the employer and carrier blur the distinction between medical or physical impairment and industrial or occupational disability.
Prior to the incident on May 27, 1977, Ms. Smith was gainfully employed. After this incident she was unable to earn the wages which she was receiving at the time of injury in the same or other employment. Therefore, the Commission's award of permanent partial disability beginning on December 14, 1979 and continuing for a period of 450 weeks is affirmed.
The order of January 20, 1986, awarding claimant temporary total disability benefits of $62.66 per week from May 27, 1977, to December 13, 1979, and permanent partial disability beginning December 14, 1979, and continuing for a period of 450 weeks is affirmed. The order to pay medical bills is affirmed. This case is remanded for further hearings to determine the amount of medical costs incurred by claimant as a result of the condition.
AFFIRMED IN PART, REMANDED IN PART.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and PITTMAN, JJ., concur.